CHRISTIAN, J.,
delivered the opinion of the court.
This case is before us on appeal from a decree of the circuit court of the city of Alexandria. The case under ordinary circumstances would have been heard by this court sitting at Richmond, it properly belonging *there, but on motion of ap-pellees. in order to have a speedy decision of the case, it was transferred to the court here. The court recognizing the importance, both to the bondholders and all other claimants, as well as the great public interests involved, in putting an end to controversies arising with respect to this, one of the 'most important railroad lines in the State, has carefully considered the numerous questions presented by the record, and has *540 arrived at its conclusions at the earliest practicable period, consistent with the pressing duties of the court here; only taking time enough to examine carefully the large and voluminous record (covering over a thousand pages of printed matter), and will now proceed to give its conclusions upon the whole case as it comes before us.
Before proceeding, however, to discuss the questions involved, it is necessary and proper to give a brief history of the proceedings in the cause.
The original bill was filed by John C. Graham, who was the holder of second and third mortgage bonds of the Orange and Alexandria railroad company. Default having been made in the payment of both principal and interest of his bonds which were then due, he brought his suit on the seventh of June, 1876, in the circuit court of Alexandria, in behalf of himself and all other creditors of the “Washington City, Virginia Midland and Great Southern Railroad Company;” which company by virtue of the powers vested in it, had assumed the indebtedness and taken the assets of the Orange and Alexandria railroad company.
The bill set forth the plaintiff’s debts, the deed securing them, and all other deeds of trust on the property of said company, or any division thereof: copies of these deeds were filed with the plaintiff’s bill.
*The bill set forth in detail, how the said defendant corporation was created, and of what its property consisted. It further set forth the consolidation of the Orange and Alexandria railroad company with the Manassas Gap railroad company, as constituting the Orange and Alexandria and Ma-nassas railroad company, and the’ subsequent consolidation of the Orange, Alexandria and Mariassas railroad company, with the Lynch-burg and Danville railroad company, which constituted, under the acts of consolidation, the said Washington City, Virginia Midland and Great Southern Railroad Company.
The bill further alleged the insolvency of said company, and that default had been made under each of said mortgage deeds, filed with the bill, both as to principal and interest.
The bill referring to the several mortgage deeds, alleges that according to the terms of said deeds, the beneficiaries thereunder are entitled to foreclose the same, and cause sale of said property to be made, for the purpose of satisfying said debts; but that owing to the complicated and conflicting nature of the claims and liens existing against said company and its property, it was impossible for the trustees in said deeds properly to administer the trusts imposed upon them by said deeds, until the conflicting claims and liens have been adjusted as to their amounts and priorities, by the intervention and aid of a court of equity.
The bill further alleges that no sale can be properly or judiciously made until such an account has been ordered and taken as will ascertain the exact status of such liens, their priorities, and the property to which the saíne will attach.
The bill further charges that there were numerous outstanding judgments and executions against said company, and that levies were being made upon property *which should properly be applied to the debts secured by the deeds of trust on said road and its divisions.
The prayer of the bill was, for an injunction to .restrain the said company from further operating or controlling the said road, and that a receiver should be appointed by the court, to take charge of the assets of the said company, under the direction of the court.
The bill further prayed for certain accounts to be taken, and for a sale of the property upon such terms and in such manner as may best promote the welfare of all parties interested therein, and for a proper distribution of the proceeds of such sale, and for general relief.
After the filing of said bill by the plaintiff Graham, many parties, creditors by bond and otherwise, filed their petitions in the same cause, asserting their several claims against the defendant corporation, and uniting with the original plaintiff in the prayer for the appointment of a receiver, and the sale of the property.
An injunction was awarded as prayed for, and John S. Barbour, Esq., was appointed receiver of the road. A decree was entered, defining his powers as receiver. An inventory was ordered of the property of the defendant corporation, and the receiver directed to account monthly before a commissioner of the court.
At the November term, 1876, the bill was taken for confessed as to all the defendants, and a general account was ordered according to the prayer of the bill.
“First. An account showing of what property, real and personal, rights and franchises. the said defendant corporation was seized and possessed.
“Second. An account of all liens of every kind, whether created by deed, judgment, or otherwise, _*resting upon said property or franchises, or any part thereof, how the same was created, and how-evidenced, and upon what portions of. said property the said liens respectively rest, the amount, order and priorities of the debts secured or evidenced by said liens, when' the said debts were or will be due, and up to what date interest has been paid thereon.
“Third. What debts are due by said company other than those secured by said liens, the amount thereof, how evidenced, and to whom due. This" account to show specifically, as far as possible, the consideration of said debts,' classifying and reporting separately: 1st. The amounts due by way of wages, salaries or fees tq the laborers, servants, agents and employees of said company prior to June 1st, 1876; showing which of said amounts are now held by the laborers, servants, agents or employees who performed the services for which said debts were contracted, and which are held by the assignees of such persons; and as to the debts so held by assignees, what considera-
*541 tion was paid by said assignees therefor. 2nd. The amount due for supplies furnished said company prior to said 1st day of June, 1876, and to whom said sums are due.
“Fourth. An account showing whether any. and if any, what contract of lease has been heretofore made between the said defendant company and the Baltimore & Ohio railroad company, whereby any part of the property, rights or franchises of said defendant company have been placed in the possession of said B. & O. R. R. Co.; what the terms of said lease; what amount is due thereon; how the rent reserved thereunder has been heretofore paid; filing with his report under this order a copy of said lease and any papers connected therewith.
“Fifth. An account showing, as far as practicable, the net revenues of each of the divisions of the road *of the said defendant company, conveyed respectively in the different deeds of trust, to-wit: the divisions lying- between the city of Alexandria and the city of Lynchburg, between the city of Lynchburg and the city of Dan-ville, and between’the town of Manassas and the town of Harrisonburg, charging each division with the cost of running and keeping the same in repair, the interest on such liens as exist thereon, and its proportionate part of the general expenses of said road, and crediting it with the receipts thereon, and its proportionate part of the receipts of said mad from through freight and travel: the account to commence on first day of December, 1876. And the said commissioner is further ordered to make a further statement showing a like division of receipts and expenditures applicable to said several divisions of said road, as far as the same is practicable, for the period of time between the date of the appointment of said receiver and the 1st of December, 1876.”
Under this order for accounts, as above set forth. Commissioner Shepperd filed an elaborate report, with accompanying depositions and papers, covering hundreds of pages of the printed record. It is not necessary to refer in detail at this point, to said report, but so much of it will be noticed hereafter, as affects in anywise the questions we have to determine.
On the 24lh of September, 1879, the appellant. Frederick E. Gibert, filed his petition, and for the first time became a party to this suit.
That, petition in substance alleged that he was the owner of the second and third mortgage bonds of the Orange and Alexandria railroad company, to the amount of $60,000, specifying the numbers and denominations of said bonds so held by him.
*He alleged that there was a combination among certain of the creditors of the defendant corporation in this suit, for the sale and purchase of the property of said company, upon which his bonds were a lien, and which combination, if carried to a successful termination would work great wrong and injury to the petitioner, and prove most oppressive to him. He filed with his said petition a paper showing the terms and conditions of said combination, and styled “A scheme for reorganization of the W. C., V. M. & G. S. R. R. Co.,” which he prayed to be read as part of his petition. He complains that by said scheme it was proposed to issue to the Baltimore and Ohio railroad company, bonds to the amount of $263,405.97 to be secured by a mortgage equal in dignity with the lien of petitioner’s bonds and thereby greatly lessening and depreciating the value of his mortgage bonds.
Upon this petition he was admitted a party plaintiff to this suit, by a decree entered on the 27th of September, 1879. By that decree there were certain further directions to Commissioner Shepperd to make further enquir-ies, and there was also a confirmation of the report of Receiver Barbour approving the agreements made with the “Charlottesville and Rapidan railroad company,” which will be noticed in another part of this opinion.
On the 13th of February, 1880, the circuit court entered an elaborate decree in which it passed upon the various claims reported by Commissioner Shepperd, and upon the various liens upon the different divisions of said railroad and their priorities. That decree contained the following provisions, which are all that it is now necessary to refer to, to-wit:
“It appearing that the property of the defendant corporation liable to said liens jnd subject to sale as hereinbefore set forth, cannot be otherwise sold to advantage *and without prejudice to the interests of the several liens and the beneficiaries thereunder, the court doth adjudge, order and decree that the rights, franchises, property and works of the defendant corporation as specifically set forth in the 37th section of this decree, be sold as an entirety free and discharged of and from the liens and encumbrances of the said several deeds of trust and judgments hereinbefore found and recited, and any and all other liens thereon: and when the sale herein ordered shall have been made and confirmed by this court, all claims and equities of redemption of the several lienholders in the order of their subordination, and of the defendant company, or of any of the companies consolidated into it, shall be forever determined and barred: and as the defendant corporation has this day filed in the papers in this cause an express waiver in writing of a day for payment and confessed its inability to pay the amount of principal and interest for which it is now in default, the said sale shall be made without further delay, and without granting any such day for payment.
“And the court doth adjudge, order and decree that John S. Barbour who is appointed commissioner for that purpose, do make the sale provided for in the last section, and do sell the rights, privileges, property, and works of the defendant corporation as set forth in the 37th section of this decree as subject to sale for the satisfaction of said liens hereinbefore enumerated in conformity to the directions hereinafter contained.
“Such sale shall be made by the commissioner at public auction, at some convenient *542 place in the city of Alexandria, in the State of Virginia, to be designated by him. Notice of the time, place and terms thereof shall be given by an advertisement which shall be published before such sale at least once a week for sixty days,” in certain newspapers therein designated. The Baltimore *and Ohio railroad company, which is the holder of all the debts secured, under what is known as the “gold mortgage,” and the defendant corporation by counsel, agreeing that such shall be the time and character of said advertisement.
“The terms upon which said commissioner shall sell said property shall be for cash as to a sum of money equal to the principal and interest of all the bonds secured by deeds-.of trust on said property or any parts thereof, except those secured by the deed of trust of the defendant corporation, dated on the 1st of May, 1873, in which D. H. Miller, Robert Garrett and john W. Burke are trustees, and for a further sum of cash equal to the past due interest on the debt secured by that deed; as to a sum equal to the principal of the debt which has been heretofore ascertained to be due under said deed, on such credit as will, meet the amount of said debt at maturity, taking care that as to such deferred payment provision be made for the purchaser to so pay interest on the purchase money in installments that the interest so to be paid by him shall meet the coupons for interest yet to fall due on said principal; and as to the residue of the purchase money, on a credit of one, two and three years, with interest from date of sale. For the deferred payments, as above provided, the commissioner shall take the obligations of the purchaser, and return them with his report of sale, when the court will direct how the payment of same shall be secured, by some satisfactory lien on the premises sold. Of the cash, which it .is herein provided shall be required on the sale of said property, $300,000 shall be paid to the commissioner within five days after said sale, and the residue shall be paid by the purchaser upon .the confirmation of said sale in such manner as the court in the decree of confirmation may direct.”
*The decree further provided that the commissioner of sale should enter into bond in the penalty of $300,000, with security to be approved by the clerk of the court, conditioned for the faithful performance of his duties as such commissioner.
It was from this decree that upon the petition of the appellant Gibert, an appeal was awarded by one of the judges of this court. In his petition for appeal there are seventeen assignments of error, which will now be noticed seriatim:
First error assigned.
“That the O. & A. R. R. Co. being in arrears of interest upon its four mortgages in or about the years 1865-7, funded the coupons .for past due interest, and issued to the holders in their place bonds for the amounts due thereon respectively. These 'funded interest bonds’ amount to many hundreds of thousands of dollars. The master stated the amount of such securities, and reported them as liens under the respective mortgages, and the court confirmed his report and so decreed. Your petitioner assigns such action of the court as erroneous.”
It was urged in argument here, that when the holder of the coupons surrendered them and accepted bonds in their stead, he consented to a.novation of the contract; that he chose to receive an instrument payable at a different date from the one originally his, and that the legal effect of the transaction was an absolute payment and discharge of the coupons.
The court is of opinion that this assignment of error is not well taken. In the first place, there is no evidence in the record that the coupons were surrendered by the holders when they accepted the funded interest *bonds. We cannot presume, in 'the absence of proof, that such surrender, contrary to all usage in such matters, was made at the time that the funded interest bonds were accepted; but, if the coupons had been surrendered and the funded interest bonds taken in lieu of them, the'legal effect would not have been to discharge the lien of the mortgages. The mortgages secured the interest, which was the debt, of which the coupons were evidence merely. The mere change of the evidences of this debt could not destroy the lien which had been given for its security. According to all the decisions there must be the clearest proof of an intention on the part of those who took the funded interest bonds to release the lien of the mortgages. They cannot be deprived of the benefit of their liens by simply accepting another security for the same debt. The acceptance, by them, of the funded interest bonds in place of the coupons, even if they were surrendered, was not an extinguishment of the debt. It was but the acceptance of another security for the same debt. It cannot, therefore, be considered as a novation of the contract, or an extinguishment and discharges of the debt evidenced by the coupons;_ the debt remains the same, but the security for its payment only is changed. See Watts v. Kinney, 3 Leigh 272; Yancey v. Mauck, 15 Gratt. 300; Meade v. Grigsby, 36 Gratt. 612; Smith & ais. v. Blackwell. 31 Gratt. 391; and the recent case of Coles v. Withers, supra 186. In the last named case, Judge Staples reviewing the cases upon the subject, says: “So long as the debt exists, the courts will never presume the chief security taken for its payment has been surrendered without satisfaction, unless upon the clearest and most convincing testimony.” The Virginia cases already cited sustain this position, and the authorities elsewhere sustain it. The rule laid down *in -1 Hilliard on Mortgages (a very high authority), is that nothing short oj payment, or express release will have that effect.
The court is therefore of opinion that the first assignment of error is not well taken.
Second assignment of error.'
“That the master in making up his statement of liens, calculated and allowedinterest *543 on all overdue coupons from the date of their maturity, placing the amount of said coupons in the column of principal. None of the mortgages under which these bonds were issued speak of coupon bonds.”
The court is of opinion that this assignment of error is not well taken. Tt will be seen from the record (p. 583) thatthe court decided that six per centum interest only should be allowed upon the funded interest bonds, and Commissioner Shepperd reformed his report accordingly (see p. 900 of the record), no interest whatever being allowed in that statement upon the “funded bonds and certificates,” and six per centum per annum only upon the bonds and certificates themselves. So much of this objection as relates to the allowance of a higher rate of interest than that borne by the original bonds is founded therefore on a mistake as to the facts.
While it is true that the mortgages do not in terms speak of the bonds as coupon bonds, there is nothing in any one of them inconsistent with the idea that they were to be issued in that form. On the contrary each of them (the mortgages) provides for and secures the payment of the interest at fixed periods (semi-annually) down to the time of the maturity of the bonds; and then for the payment of the principal. The most appropriate, if not the universal mode in which the ^interest thus to become due and payable on railroad bonds is evidenced, is by a coupon for each installment attached to the bond upon which the interest represented by it is to accrue. Bonds with coupons attached were accordingly issued under each and all of the mortgages without objection from any quarter; and without question raised by any party, until after the institution of this suit, as to the propriety of issuing bonds in that form. Indeed the very bonds which the appellant himself holds are of this character which he now objects to for the first time. It may be therefore confidently asserted that the issue of coupon bonds was in conformity with the provisions of the mortgages and fully authorized by them; and this being true, there can be no doubt that the coupons carried interest from the time that the company was in default in paying them, and that such interest was secured by the lien of the mortgages. For authority for this proposition we refer to Arents v. Commonwealth, 18 Gratt. 750; Aurora City v. West, 7 Wall. U. S. R. 82, 105; Town of Genoa v. Woodruff, 2 Otto U. S. R. 502.
We are therefore of opinion that the second assignment of error is not well taken.
Third assignment of error.
“That the circuit court authorized and empowered the receiver to lay out $10,000, to aid in constructing a short branch road connecting with the Lynchburg and Danville division, said branch road being built and owned by another corporation.”
It may be first observed that there is an error of fact in this assignment of error. The branch road does not belong to another corporation. The record shows that every foot of that road belongs to the Midland ^Railroad Company, and it is specifically named in the final order of sale as a part of the assets to be sold.
The decree complained of in this assignment of error was entered on the 31st of November, 1877. It appears that at that time there were no parties objecting to it. but it was entered, as shown by the very terms of the decree, upon the suggestion to the court, that the interest of all "the parties to the suit would be promoted by an expenditure of a portion of' the receipts of said road in the hands of the receiver, in aiding in the construction of a short branch therefrom, extending from a point upon the Lynchburg and Danville division, between Sycamore and Ward Spring stations, westward to the iron ore banks near Pig river; and the court being of opinion that such extension of the road would promote the interests of all the parties concerned, directed said receiver, out of such funds as may be in his hands to be administered, to expend irs the construction of said branch road a sum not to exceed $10,000, in amount, provided said receiver shall be satisfied upon a further examination of the matter, that such outlay will be judicious; and provided further that he shall not expend said sum or any part, thereof until he shall be satisfied that such expenditure will insure the construction of the whole of sjid branch road to said ore banks. The record shows that this work was completed in a few months at a cost to the receiver of less than $8,000, the residue of the cost being borne by persons interested in the ore banks. The receipts from this stem of the road paid back, as the record shows, all it cost in a little over six months, and it has ever since been a most valuable feeder to the main line, paying nearly $300 per day thereto on account of the large amount of iron ore transported over said branch road.
*Without deciding the question as to the power of the court as an original proposition, to make such expenditure, we think it is plain that this action of the court empowering its receiver to make this expenditure of $10,000, was eminently advantageous, as the sequel showed, in adding largely to the receipts of the road, and promoting the interests of all parties interested in its welfare.
No complaint was made from any quarter for more than two years after this wise and judicious action of the court. It is too late now to make any such objection.
The road has already been built, and is in greatly successful operation. The money has already been expended. Who is to pay it back if the appropriation was wrong? The court — or the receiver? Neither of course-can be held liable. The expenditure of $10,-000 brought large receipts into the treasury of the road, and manifestly promoted the-interests of all the bondholders, lienhold-ers and others creditors against the road.
We are therefore of opinion that the third' assignment of error is not well taken, and: must be overruled.
*544 Fourth assignment of error.
“That the court authorized and empowered the said receiver to lease two other lines of railway, the property of two other corporations, viz: the ‘Charlottesville & Rapidan' railroad’ and the Franklin & Pittsylvania R. R. The first-named railroad, to-wit: the‘Charl-ottesville & Rapidan R. R.’ was chartered by the general assembly by an act passed February 13th, 1876. This charter was amended February 6th, 1878. By the original act it was to extend, under its charter, from Charlottes-ville to Orange C. H. By the amended *act, power was given it to lease its road to any other company, and to borrow money and make a mortgage to secure it. It is manifest, and a mere reference to these acts makes it apparent, that this road was incorporated by the legislature, for the purpose of meeting a great want of the Virg’a Midland Company; for before that time the trains of that company were compelled to run over the track of the Chesapeake & Ohio Co., for which privilege the company had to pay an annual rent of $30,000. And although it paid so large a rental for the use of the road between these two points, its use was subordinate to the control of the C. & O. Co., and that too without the privilege of doing any local business between Gordons-ville and Charlottesville or any intermediate points; a'nd besides that, was excluded from northbound business at Charlottesville or southbound at Gordonsville. It is therefore plain that, in order to the full development and welfare of the Midland line, its track should be continuous and under its own management. This new company in June, 1878, made a proposition to Receiver Barbour which is fully set forth in his report (on p. 536 of the record). The substance of the proposition was that the new company would lease its road to the Midland Co. for a period of thirty-four years for the annual rent of $36,000, and at the end of that time all the property, works and franchises of said road should be ‘used, occupied and possessed by the said Midland road forever.’ ”
The court is of opinion that the circuit court, under its discretionary power, had the authority to direct its receiver to accept the proposition made by the Charlottesville and Rapidan company, and to confirm his action In the premises. It was of manifest advantage to all the lienholders and all other creditors interested in the *Midland road that this missing link between Charlottsville and Gordonsville should be supplied, thus forming a continuity of line under the control and management of the Midland company. The advantage on all hands is very apparent when it is remembered that for a sum but little over the annual rent it was already paying to another company under the great disadvantages of being subordinated to its control, it thereby secured, not only the control of a continuous line, but at the end of 34 years the whole property, works and franchises of the new company would belong in fee simple to the Midland company. The advantages of this arrangement being so apparent and not objected to by any parties before the court — not even by the appellant here — the only question is, did the court have the power, in the exercise of a sound discretion, to authorize and •confirm this act of its receiver. We think it undoubtedly had that power and that it was its duty so to exercise it. A court of equity having in charge the mortgaged property of a railroad company, is authorized to do all acts that may be necessary within its corporate power to preserve the property, and to give to it additional value, not only for the benefit of the lien creditors, but also for the benefit of the company, whose possession the court has displaced by the' appointment of a receiver, and by taking into its own hands the property, rights, works and franchises of the company. Any act. it would seem, necessary for the protection and preservation of the property, is a legitimate and proper act, and whatever is manifestly appropriate to such preservation and protection, or to the enhancement of the value of the property, not in excess of the powers of the corporation, will always be upheld and enforced by the courts. 4 Otto U. S. R. 734 (Jerome v. McCarter); Wallace v. Loomis, 7 Otto U. S. R. 146, 163. The receiver, in making this contract, ;|tand the court, in authorizing and approving it. were but carrying out the powers granted by the legislature, on the 2.8th March, 1871, (Acts 1870-1.p. 293), when it authorized the Orange, Alexandria and Manassas railroad company “to construct a railway from Orange C. IT. or Gordonsville, or some point on the line of their road between these places, to some suitable point on their road between Char-lottesville and Lynchburg, or on the C. & O. R. R.. so as to connect the eastern portion of their road with the southwestern extension from Charlottesville to Lynchburg.”
Now as to the lease of the Franklin and Pittsylvania railroad, which is the second branch of the fourth assignment of error, that road was chartered by the legislature on March 13, 1878. (see Acts 1878-79, p. 203) for the purpose of constructing a narrow-gauge railway from Rocky Mount, in Franklin county, to Pittsville, in Pittsylvania county, and the same act gave to this company the power to lease the road when built, to the “Midland road.” The legislature by its charter, having given the power to lease the road, when built, to the “Midland road,” the intelligent receiver, who had been president of the “Midland road.” and knew well all its interests, recommended to the court, by a report filed in May, 1878, (see page 518 of the record) that the “Midland road” should lease, as it was authorized to do under the act of assembly, the Franklin and Pittsylvania railroad. It would'extend this opinion to too great length to quote the report of the receiver, to show the reasons which he urged upon the court to authorize such lease. It is sufficient to say that no man can read that elaborate report without coming to the conclusion that it was very advantageous to the interests of the “Midland road” that this lease should be authorized and confirmed by the court.
*545 *The report of the receiver shows that this short line of road — a distance of about thirty miles — would be a most valuable tributary to the “Midland R. R.”; that it penetrated a rich and productive country, and especially gave access to valuable banks of iron ore necessary to the manufacture of Bessimer steel.
'The terms of the lease were most advantageous to the Midland Company, because it would receive a road built and equipped by the Franklin and Pittsylvania railroad company, at its own cost and then leased for thirty-four years to the “Midland road,” the lessee paying- only $7,000 per annum therefor. The record shows that this lease, so made by the receiver and confirmed by the court, was of great and manifest advantage to all interested in the prosperity and welfare and successful operation of the “Midland R. R.” All that has been heretofore said, and the authorities referred to to sustain what was said, with reference to the lease of the Char-lottesville and Rapidan railroad, apply with full force to the lease made and confirmed of the Franklin and Pittsylvania railroad. The court is therefore of opinion that the fourth assignment of error is not well taken.
Fifth assignment of error.
“That the lease made by the defendant corporation to the B. & O. R. R. Co., of that portion of its road lying between Har-risonburg and Strasburg was recognized by the court as valid, when there has up to this time never been any legislative authority for such lease.”
It is sufficient to say that the lease, of which complainant is here made, was entered into by the “Virginia Midland” Road on thp 20th August, 1873, three years *before the suit was brought. The record shows that the court below did not make this lease. When it took charge of the property this lease was an accomplished fact, and certainly, as the record shows, a valuable one for the company. The court did not, ex mero motu, set aside this lease. No one objected to it; it was already done, and was manifestly an advantage to all parties interested in the “Midland Road.”
The fust objection found to this arrangement is made by the appellant who was already a bondholder materially benefitted thereby and who by implication ratified the same. The court is therefore of opinion that no question having been raised by any of the parties interested, in the pleadings in this cause, and the lease having been made before the court took possession of the subject, and it being manifestly beneficial to all parties concerned; the said fifth assignment of error is not well taken.
Sixth assignment of error.
“The action of the court in requiring the purchaser of the defendant corporation’s franchises and property to take them subject to the leases herein before recited.”
It is sufficient to say that this question has already been disposed of in what has already been said respecting the fourth assignment of error; the court below and this court being of opinion that said leases were of manifest advantage and promoted the welfare and general condition of the “Mid.land” Company.
Seventh assignment of error.
“That by section 44 of the decree of sale (p. 1016 of the Rec.) only 60 days’ notice of the time and place *of sale was required to be given, and that to be published in each of the cities of Alexandria and Lynchburg in the State of Virginia and in Baltimore and New York.”
It is true that what is known as the “Gold mortgage” required that there should be ninety days’ notice, and that publication should also be made in Philadelphia, Boston and London; the decree of the court below explains this change in the terms and time of notice by declaring in section forty-four, that the Baltimore and Ohio railroad company, which is the holder of all the debts secured under what is known as the “Gold mortgage,” and the defendant corporation agreeing by counsel that such should be the time and character of the advertisement. This assignment of error is therefore not. well taken.
Eighth assignment of error.
“That the sale of the Lynchburg and Danville division was not directed to be made in Lynchburg as provided in the Lynchburg and Danville mortgage.”
This involves the question oí a sale as an entirety, which will be considered hereafter.
Ninth assignment of error.
“That there should not have been any decree for sale at all, but that the revenues of the main line should have been applied to the extinguishment, principal and interest of the four O. & A. mortgages in the order of their priority.”
It is sufficient to say that such a scheme would have been utterly impracticable. The record shows that *the net revenues of the whole road were $370,000, and the total amount of the first four Orange and Alexandria mortgages on the 1st of January, 1880, was $4,813,078.24. The average rate of interest on this amount at seven per centum would be for one year $290,075.59. A simple calculation would show that it would take something like fifty years to pay off the? principal and interest of the first four mortgages. Of course such a scheme was totally impracticable.
Tenth assignment of error.
“That the mortgages of the O. & A. R. R. Co. constituted liens upon the Manassas Gap R. R. prior in dignity to the O., A. & Manas-sas R. R. and all subsequent mortgages.”
The court below was of opinion that the said first mortgage of the Orange, Alexandria and Manassas railroad company takes priority as to so much of the road of the defendant corporation as lies between Manassas and Harrisonburg, the said portion of said road *546 not being after-acquired property of the Orange and Alexandria railroad' company, which passed under its then existing mortgages, upon its consolidation with the Ma-nassas Gap railroad company, under the act of assembly authorizing such consolidation. We are of opinion that the circuit court was right in this conclusion. The record shows that there was a company known as the Orange and Alexandria railroad company, which worked and owned a road from Alexandria to Lynchburg; and'there was another known as the Manassas Gap railroad company, which -worked and owned a road from Manassas to Harrisonburg. In 1867 by virtue of an act of assembly empowering them to do" so, the said companies consolidated, upon terms *mutually agreed upon, and the consolidated company was known as the Orange and Alexandria and Manassas railroad company, and as such and by virtue of an act of the ^ legislature, made a mortgage upon the joint property. Under these circumstances, neither of these companies acquired the other, and neither road is “after-acquired property” to the other. They were co-ordinate, and by an act of assembly were united as a new company, with the power to make a deed of trust on the joint property. The term ^“after-acquired property” applies to such necessary accretions as are requisite to keep up the road, such as new rails, cross-ties, depots, rolling stock, machinery, and, it may be, real estate required for the legitimate purposes of the corporation. But it surely cannot cover a different road belonging to another corporation which either by purchase or legislative enactment becomes united with or consolidated into it. Nor can it cover any property, right or franchise which according to its charter, at the date of the use of the term “after-acquired property,” it had no right to hold, assert or exercise. These principles are well settled by the decision of this court in the case of Alex. & 'trFred. Co.’s Trustees v. Graham, 31 Gratt. ’ 769, which is conclusive on this point. The court is therefore of opinion that the tenth assignment of error is not well taken.
The eleventh, twelfth, fourteenth, and sixteenth assignments of error may be treated together. - '
They all in different forms raise the question as to whether the circuit court erred in directing a sale of the whole road as an entirety. Or, in other words, whether, under the terms of the various mortgage deeds, it was not the duty of the court to decree a sale of the different divisional roads consolidated into the Washington City, Virginia Midland and Great Southern Railroad Company.
*This consolidated road is composed of three divisions: 1st. The Orange and Alexandria railroad, which under its original charter had authority to build a railroad from Alexandria to. Gordonsville; 3d. The division extending from Charlottesville to Lynch-burg; and a third division, the construction of a road from Lynchburg to Danville.
These three divisional railroads were consolidated into one by an act of the general assembly, and the consolidated company thus created was thereafter called and known as the Washington City, Virginia Midland and Great Southern Railroad Company, thus forming a continuous line of railroad from Alexandria to Danville.
The question presented to the court below was, whether to sell this line of railroad by sections and divisions, in accordance with the mortgages on the several divisions, or to. sell the whole as an entirety and to distribute the proceeds after sale among the lienholders of the separate divisions, according to equitable principles of distribution.
It being apparent that there must be a sale to meet the- principal and interest overdue, and no party in interest disputing the necessity for a sale, but all agreeing that such sale must be made, the question before the court below was, as to how such sale should be effected.
The court therefore very properly directed an enquiry as to the best mode of bringing the property into the market, and accordingly directed its commissioner to enquire whether the interest of all the parties interested will best be subserved by a sale of the road as an entirety or by a sale of the divisions upon which the several mortgages respectively rest.
The commissioner considered the subject carefully and elaborately, and examined distinguished railroad ’men, and came to a very decided conclusion that it is to the interest of all parties concerned to have a sale of the road as an entirety, and stated in his report that it .would hardly be practicable to sell the road in divisions as there were so many interests in common between the respective divisions (see record, page 894). Upon the return of this report, the court decreed that “the premises, rights, franchises, works and property of the defendant corporation cannot be sold in parcels without loss and prejudice to all parties interested therein, and that the nature and situation of the property is such that the interest of all parties requires that it shall be sold as an entirety.”
The court is of opinion that this conclusion of the circuit court was plainly right, and that it was manifestly in the interests of all the parties interested, including the appellant.
In the opinion of this court, it would, on the contrary, have been plainly erroneous if the court below had decreed a sale by sections, or parcels, or divisions of this line of railroad.
The value of a railroad consist generally in its length, continuity and connections, and the business which it can accomplish. Its value is not to be estimated by its rolling stock and cars and depots and real estate acquired, but its great value is in the length and continuity of the line and the connections which it forms between different points of trade and commerce. The great value of this road is that it extends across the State from tidewater nearly to the boundary of the southern line of Virginia, at Danville.
Taken together as a whole, with all its di *547 visions consolidated, and its collateral feeders, it becomes one of the most important railroad lines of the State. Manifestly its great value depends upon its length of line and continuity and connections. If cut up into parcels, *and sold by divisions, it would lose its great value as a continuous line of road. If thus, sold, the lienholders on the different divisions would not realize the same amount as if sold as an entirety. It was argued that to sell the road as an entirety would be in violation of the contract of mortgage-liens upon the separate divisions. The plain answer to this proposition is, that a sale of all the different divisions at the same time carries out effectually the contract to sell upon default each separate division. And the fact that the particular separate division on which the mortgage rests, is sold at . the same time and together with other divisions of the road, is in no manner a violation of the contract of the mortgagee.
But in the decree of the court below ample justice is done to all the lien creditors of the different divisions of this railroad. The -•-fund, after sale, is to be apportioned according to the earnings of the different divisions of this railroad upon equitable principles, reported by the commissioner, after examination of experts familiar with the subject. And the result is that the lien holders of the different divisions will get in the distribution the proportion to which they are entitled, which is certainly more favorable to them than a sale of the road in oarcels and divisions. Indeed it is manifest that such a sale would not only be injurious to other parties interested but would give to them (the mortgages on divisions of said road) a larger per centum of their debts than if the sale was directed to be made in parcels, and by divisions of the roadi
After a careful consideration of the report of the commissioner, and the evidence returned therewith, the court is of the opinion that it is to the manifest interest of all parties interested that the sale should be made of the said railroad as an entirety, and that the circuit court was right in decreeing such sale, and *that such sale will violate none of the contract rights of the mortgagees.
There are only two remaining questions to be considered, as set forth in the. petition for appeal, which will now be briefly noticed. One arises upon the report of the commissioner, in which it is insisted here, interest upon interest was reported by the commissioner and confirmed by the court; and the other remaining question, is, as to the priority of the liens of certain, executions upon judgments obtained against the railroad for labor of employees, and damages for destruction of property, &c.
As to the first question, it may be remarked that the record shows that there was no exception to the commissioner’s report in this respect. The report returned covered hundreds of pages and multifarious subjects. It.was the duty of the parties objecting to this part of the report to put their fingers on the point, and call it specially to the attention of the court. This was not done, and it is not surprising that the court should have overlooked, amid such a mass of different questions submitted, this unimportant question of the rate of interest charged by the commissioner. We do not mean to pass upon this question and to say in this opinion whether the interest charged by the commissioner was correctly charged or not. It is sufficient to say that if there was error in this charge of interest (upon which we express no opinion) the court may hereafter correct it when it comes to distribute the fund. Certainly, if erroneous, it cannot interfere with the great question in the case, as to whether the sale of the entire railroad should be confirmed as ordered by the court. It will be time enough when the fund comes to be administered by the court, for the court to correct this error, if error it be.
*And now as to the question whether the executions issued upon judgments obtained against the company, the court does not now feel called upon to express any opinion, especially as these questions are involved in appeals taken in this same case and now pending at Richmond. All these questions may be, and will be, properly decided when the fund arising from the sale of the railroad comes into the hands of the court for distribution, and will in the meantime be decided by this court in the several causes now pending in this court at Richmond.
Neither of these questions (to-wit: the question of interest upon interest, and the question of priority of executions over the liens of the deeds of trust), whether the decree of the said circuit court is erroneous or not in these respects, can at all interfere with the power of the court to make sale of the property as an entirety. The amounts involved are comparatively insignificant, and even if erroneously decreed, cannot effect the great question in the case, as to the sale of the property as an entirety. These questions will be postponed to the time when the distribution of the fund becomes necessary.
There is one other question not présente! in the petition of appeal, but very earnestly argued at the bar here; and that is, as to proper parties. It is insisted by the learned counsel for the appellant that the trustees in the several mortgage deeds being dead, the legal title was outstanding and that there was no one before the court to represent that legal title.
With respect to this argument, it is sufficient to remark, that if on the death of the trustee, Lamar, the legal title was in abeyance, that would not defeat the trust, nor prevent the jurisdiction of the court from attaching, in the absence of a representative of the legal title, no such representative being in existence. Indeed *it would be a potent reason for the court to pro *548 ceed, and take upon itself the execution of the trust, on the principle, that a court of equity will never suffer a trust to fail, for want. of a.trustee. If however, the legal title is not in abeyance, then upon the death of Lamar it either devolved by operation of the statute (Code 1873, ch. 174, § 9), on Lamar’s personal representative, or else it resulted to the old companies, and passed under the consolidation acts to the new company, and in either case such title was represented by parties before the court. So that in any order to be taken all necessary parties were before the court below.
That court having possession of the property, works, rights and franchises of the company, will have no difficulty in conveying the mere legal title to the purchaser whenever it becomes necessary and proper.
Upon the whole case the court is of opinion that there is no error in the decree appealed from, and that the same so far as it affects the questions presented by the record and petition for appeal before us must be affirmed.
The decree was as follows:
This day came again the parties by their counsel, and the court having maturely considered the transcript of the record of the decrees aforesaid and the arguments of counsel, is of opinion, for reasons stated in writing and filed withffhe record, that there is no error in the several decrees of the said circuit court, appealed from by the appellant, F. E. Gibert, as to which the decree of this court is now rendered. It is therefore decreed and ordered that the said several decrees, except so far as hereinafterwards mentioned, be in all respect's affirmed; and that the appellees recover against the appellant their costs by them *exp ended in the defence of the appeal and supersedeas here. But the court expressly reserves for future decision so much of the appellant’s thirteenth assignment of error as applies to the decree of said circuit court for the payment of sundry executions therein named. And this court now expressing no opinion as to the question of compound interest raised on- the appeal, leaves that question open to the court below when it comes to distribute the fund after the sale among the parties entitled thereto.
And it is expressly further provided that the questions on sundry appeals granted to Wm. J. Robertson, J. R. Tucker, the Abbott iron company, Williamson’s administrator and Reed & Morton, and the question arising on the twenty-first section of the decree of said circuit court rendered on the lísth of February, 1880, which rejected the claim of Sarah G. Smith, executrix of F. X,. Smith, shall not be in any manner affected by this decree, but that all of said questions will be considered by the court at its term to be held in Richmond. All which is ordered to be certified to the said circuit court of the city of Alexandria.
By order of October 14th, 1880, the case was removed to Richmond.
Decree affirmed.